## BLACKWELL–WEILANDY CO. v. SABINE SUPPLY CO.

### No. 2446.

Court of Civil Appeals of Texas. Beaumont.

Oct. 26, 1933.

Crook, Lefler & Cunningham, of Beaumont, for plaintiff in error.

W. E. Lea and Fred L. Williams, both of Orange, for defendant in error.

WALKER, Chief Justice.

This appeal is by writ of error, but the parties will be referred to as appellant and appellee. A former appeal is reported, Blackwell-Weilandy Co. v. Sabine Supply Co. (Tex. Civ. App.) 38 S.W.(2d) 654. The suit was by appellant, Blackwell-Weilandy Company, versus appellee, Sabine Supply Company, to recover certain specific charges for compiling a catalogue, made by appellant for the use of appellee, under a contract dated March 1, 1924, but not accepted by appellee until March 15, 1924. The catalogues were completed and delivered, and invoices for their cost were mailed by appellant to appellee, dated June 30, 1926, as follows: Invoice No. 1 was for $12,691, which was duly paid by appellee; invoice No. 2 was as follows:

| "Class or Key Number | Charges for Postg. & Ins. | Amt. of Invoice including Post. |
|---|---|---|
| "Additional compilers time required for changing original data sheets received after 4 months, as agreed in contract | | 2996 00" |

Attached to this invoice was an itemized statement of the work which it covered, with the date the work was done and figures identifying the employees who did the work; the invoice was for 1,498 hours at $2 per hour. Appellant does not contend that the items charged for in the second invoice were authorized by supplemental contract or that appellant, on an independent consideration, accepted and agreed to pay the invoice. Appellant's only contention is that the items charged in the second invoice were specifically covered by the original contract. The trial was to a jury, and judgment was for appellee, upon an instructed verdict, that appellant recover nothing and go hence without day.

The contract, in so far as it related to the issue in controversy herein, was as follows:

"Alterations: (a) All changes made after pages are set in type from copy approved by customer or changes made in standing type matter, will be charged for at $2.75 per hour.

"(b) All changes in new compiled copy before page is set in type will be made without charge, excepting where it is necessary to recompile the copy. A charge of $5.00 per page will be made per each page recompiled.

"(c) Should it be necessary to eliminate items from the pages after being compiled or set in type, sufficient data must be furnished to fill the open space, if items are canceled a charge covering the compilation or composition or both, as the case may be, will be made."

For purposes of reference we have marked these separate paragraphs as (a), (b), and (c). Appellant contends that invoice No. 2 was au-

thorized by paragraph (c), and was therefore a proper charge under the contract. Appellee contends that all charges covered by invoice No. 2 came within the provisions of paragraphs (a) and (b), and were therefore covered by invoice No. 1. As we construe the record, there is no conflict in the testimony on the issue between appellant and appellee. The evidence is as follows: The following quotation is taken from a letter from appellee to appellant, written after both invoices had been received.

"July 7th, 1926.

"Mr. E. J. Kehlenbrink, Blackwell-Weilandy Book & Stationery Co., St. Louis, Mo.

"Dear Sir: We are in receipt of your letter of the 25. and have since received the shipment of catalogs. We have gone over the whole catalog very carefully. In the first place, the cover about which we have been a little anxious, in knowing how it would show up after printed, is very attractive and has already created some favorable comments among the people who have received our catalog. The catalog as arranged and printed is also very satisfactory, furthermore, it is different from the general run of catalogs which we have in our files from jobbers in our section. The size of the sheet is better suited to the class of goods we are showing. In reviewing the whole catalog we do not see very well how it could have been improved.

"Now with reference to the invoices received from you covering this work. We have finished checking the items on invoice for $12,691.00 and find them in line with the contract. We are bound to take exception, however, to your invoice for $2,996.00 which is not according to contract. According to our records Mr. Ficker arrived and reported to us about July 5th, 1924 and left us the middle of August."

On August 4, 1926, appellant wrote appellee as follows: "On the writer's last visit to Orange we had a talk regarding the catalog situation, and at your suggestion we invoiced it strictly according to contract, but as explained before, this job represents a complete loss to us and, therefore, we forwarded you an additional invoice, which we now inclose again."

Mr. E. J. Kehlenbrink, manager of appellant's catalogue department, testified as follows (question and answer form reduced to narrative form):

"In building a general hardware catalog such as the one built for Sabine Supply Company, the first thing to do is to have the data sheets made up showing the items that are to be listed in the catalog, and they are taken back to St. Louis to be checked as to the number and from whom it is bought; that means that we must write or wire the manufacturer for the correct information; that means that we must get a catalog from the manufacturer listing the items, and when the catalog is received it usually doesn't have the information that we want and we must then use our forms to specify what is to make a proper description of the item, and we then go to the manufacturer again for the engraving in order to illustrate the item. When this material is received we are ready to go to work and write up the catalog. A catalog is usually divided into various sections in order to shorten the time to make up a catalog, so when we get all the data together that is required to make up a particular section and when the section is finished we send it to the customer for his approval. We either take the required items out of the manufacturer's catalog or get the information direct from him; we then make a dummy of that particular section and send it to the customer and when o. k.'d by him and sent back to us it is ready for the composing room, but first let me define compilation. It includes the securing of data, the checking of data, securing information and cuts from manufacturers—that is one operation or condition. The second operation is compiling the copies, that is making up manuscripts of the illustrations, but the charge referred to in our claim is work that we did on the data sheets before the copies were put in manuscript form. There is a clause in the contract which covers changes in the data sheets as part of the compilation, there are two charges for that work, one for each new compiled page, $17.25. That means that we are to compile, get together, edit, print and build complete one page; and for each standard type page the price is $7.50. The difference in this price comes about because the standing page is information that is obtained from our files—that means items that are selected by the jobber that have no compilation; the difference between $17.25 for each new compiled page and $7.50 for each standing page would be $9.75, and that is to pay for the compilation and our overhead, postage, etc. That does not pay for all the changes to be made by us; the difference of $9.75 is to obtain data for extra work that is to be done in compiling the catalog.

" * * * When we send the manuscript copy to the customer to look it over and if he decides that some items should be reworked, that is what we call recompiling. Sometimes it means taking an item from one page and transferring to another page; the charge for recompiling is $5.00 per page; the contract states that there were 18½ pages compiled copy killed and not used in catalog, at $5.00 per page $92.50; and they were pages that were sent to the Sabine Supply Company and o. k.'d by them before we set them in type. If items are cancelled a charge covering the cancellation or compilation, as the case may be, will be made. That is not recompilation. The charge of $17.25 per page covered the compiling of it, but

the extra charge of $92.50 covered 18½ pages compiled copy killed and not used. The invoice of $12,691.00 that was submitted to the Sabine Supply Company was not supposed to cover every charge of every kind that could be made under the contract; the additional compilers' time required for changing the original data sheets received after four months was agreed to in the contract and was to be invoiced separately; it was suggested by Mr. Brown to invoice it that way. I can't recall the whole conversation—that was some four or five years ago, but he suggested that we make a separate invoice for the additional compilers' time that would be required in building the catalog; I can't remember all that was said but that was the essence of the conversation. This invoice for $12,691.00 was paid promptly; I don't know how long it took them to pay it but there is no question about it having been paid; I think the terms of the contract were carried out; the invoice is dated June 30th, 1926, and it was paid on July 7th, 1926. It was paid within the 30 days as specified under the terms of the contract.

"* * * And in the letter submitted and introduced as Exhibit No. 'F' in which we say, approximately 5 months, nearly 6 months after the first date on which we charged the Sabine Supply Company for extra, 'We expect to commence the compilation of your book soon, and would like to know if you are contemplating to make additional changes, and if possible please let us have them as soon as possible,' that is for increased cost of compilation, that statement. We notified the Sabine Supply Company, during the period of the contract, that there would be an extra charge for extra work in compiling the catalog; this was during a conversation with Mr. Brown, I think it was in April, 1926. The catalog was delivered sometime in June, 1926. The largest portion of the work had been done at the time we notified Mr. Brown that there would be an extra charge. We completed the work within sixty days after receiving the last changes. I told Mr. Brown the catalog would cost more on account of changes. The data sheet work is provided for in the price per page of the work on the original selection of items, but not for additional changes made on the data sheets. Our contract states that all changes will be made without charge excepting where it is necessary to recompile the copies and that a charge of $5.00 per page will be made for each page recompiled. The changes made in the new compiled copy before set in type were to be made without charge in the original catalog excepting where it was necessary to recompile the copies. The difference in those two paragraphs where it provides for changes in new compiled copies and where items are canceled is between the copying of the items that may be canceled before it gets into the compiled copy. And all of that additional work is included in the invoice amounting to $2,996.00, which is set forth in the contract. The price of $2.00 per hour, as shown on the statement, was additional compilers' time, shown in hours and units of hours (100 units to the hour), required for changing original data sheets, as ordered by the Sabine Supply Company; this itemized list shows 100 units to the hour.

"* * * On the statement I have just testified about it reads 'Additional compilers' time, shown in hours and units of hours (100 units to the hour) required for changing original data sheets, as ordered by the Sabine Supply Company; that list was made from our daily time records; somebody in the employ of the Blackwell-Weilandy Company made it and handed it to me; I didn't make it myself; I checked it myself. That is a daily time record which is turned in by each employee showing the nature of the work that he did, and the time he put in on this particular job. It doesn't show the nature of the changes made on the data sheets, it only shows the time he put in and shows that he made changes in the original data sheet that he received from the Sabine Supply Company. Possibly the word 'additional' in the statement is confusing. It should have been 'increased.' The word 'increased' means time that was consumed on the particular job over what we estimated in the building of the catalog. The statement represents the amount of work that was done that was not covered by the $12,691.00 invoice; it represents the amount we claim the Sabine Supply Company owes our company over and above the $12,691.00 invoice which has been paid."

On the 19th of November, 1924, appellant wrote appellee as follows:

"Gentlemen: In reply to your letter of November 17th, wish to advise that it will be perfectly satisfactory to us for you to substitute data sheets in the F. section.

"Permit the writer to suggest that it is not necessary at this time for you to write us regarding data sheets of this kind, but simply give us the changes to be made and we will do all in our power to make them, as a matter of fact these changes can easily be made up to the time the pages are compiled. You understand, of course, that your catalog is now in the stage of securing cuts and information, but in a very short time we expect to compile same, and before we do this we will advise you of the fact so as to find out if you have any further changes to be made at that time.

"We hope this is the information you desire and look forward to receiving new data sheets covering the changes you suggest at an early date."

On March 11, 1925, appellant wrote appellee as follows: "It is important that changes

be made on this compiled copy as the pages will be set in type when they are returned to us and after they are set in type any further changes will be charged for as alterations."

Mr. B. F. Brown, appellee's president, testified as follows, which in no way conflicted with any testimony offered by appellant (question and answer form reduced to narrative form): "At the time of signing the contract or at any time thereafter I did not know there were to be any charges for the changing of data sheets; the first time I was aware that there would be an extra charge for this was upon receipt of an invoice for $2996.00; the invoice is here. I had a conversation with Mr. Kehlenbrink in my office sometime in the year 1926; I don't know the exact date, but I think it was in April, possibly two or three months before the receipt of the catalog. My recollection of what that conversation was—Mr. Kehlenbrink, in the first place, brought me a drawing of the cover or front page of the catalog and asked my approval of it, which I gave him, and as he was leaving my office he said to me: 'This catalog is going to cost more than I expected', and, while I don't recall exactly what he said, he said there would be an extra charge, and I told him to invoice us strictly according to our contract."

Referring to invoice No. 1 for $12,691, Mr. Brown testified:

"The invoice was paid on July 27th, therefore this letter was written 20 days before the payment of the invoice. This is an invoice from Blackwell-Weilandy Company for the making of a catalog and built according to the contract. I received this invoice from our Mr. Reinhardt, who first received it from the Blackwell-Weilandy Co., and checked it and then turned it over to me with his o. k. thereon. These are his initials here (indicating). At the time I paid this invoice I considered that it covered all items chargeable under the contract. I paid it because it checked out correctly according to the contract.

"Up until the time the invoice for $2996.00 was presented, I didn't know there would be any extra charge for changes in data sheets. It was not my interpretation of the contract that if items in the data sheets were cancelled I expected, as you say it is provided in the contract, to pay for them. I don't say that the cancellations here are not provided for in this paragraph of the contract. All the sheets are sent back when necessary alterations are made on them; suppose we eliminated or cancelled certain items from our sheets, I think that is provided for in this change and not in the cancellation.

"This is a data sheet. I do not see any place on the sheet where it says that a charge will be made if it is cancelled. There is a difference in the sheets, that is, between that sheet and the compilation sheet. The contract says, where items are cancelled a charge covering the compilation will be made; as to what compilation means, I don't exactly understand the process after it reaches the print, but in my opinion it is the assembling of the written matter on the galley sheets. I may be mistaken, but I would say that compilation doesn't, to my mind, mean the setting of type."

The above testimony shows conclusively that the charges covered by invoice No. 2, sued for herein, were not properly charged under section (c) of the contract copied above, but fell strictly within the provisions of section (b) of the contract.

The letter from appellant to appellee, dated August 4, 1926, contained the specific statement that invoice No. 1 covered the catalogue work "strictly according to contract," and the clear inference from the balance of the quotation from that letter is that invoice No. 2 was merely to cover appellant's loss, which, of course, appellee was not bound to pay. Again, near the end of the quotation from the testimony of Mr. Kehlenbrink, supra, is the statement that invoice No. 2 was "additional compilers' time * * * required for changing original data sheets" before the page was set in type, which, under the express provisions of paragraph (b) of the contract, were to be made "without charge." Paragraph (c), upon which appellant relies, provides merely for "covering the compilation or composition" of canceled items. Mr. Kehlenbrink defines "compilation" as follows: "It includes the securing of data, the checking of data, securing information and cuts from manufacturers—that is one operation or condition. The second operation is compiling the copies, that is, making up manuscripts of the illustrations."

Mr. Kehlenbrink testified immediately following the above definition that "the charge referred to in our claim is work that we did on the data sheets before the copies were put in manuscript form." This statement alone, in our judgment, takes appellant's claim out of paragraph (c), and brings it within the provisions of paragraph (b) providing: "All changes in new compiled copy before page is set in type will be made without charge." There is no room for construction of Mr. Kehlenbrink's testimony. He says the charges included in invoice No. 2 were for work done "before the copies were put in manuscript form."

It follows that the judgment of the lower court should be in all things affirmed, and it is accordingly so ordered.

Affirmed.